UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO

COMMERCE BENEFITS GROUP, INC.,

Plaintiff,

vs.

MCKESSON CORPORATION, ET AL.

Defendants.

CASE NO.: 1:07-CV-2036

OPINION & ORDER
[Resolving Doc. Nos. 29, 54, 69]

JAMES S. GWIN, UNITED STATES DISTRICT JUDGE:

Defendants McKesson Corporation ("McKesson") and Per-Se Technologies, Inc. ("Per-Se") have filed motions for summary judgment. [Docs. 29, 54.] Plaintiff Commerce Benefits Group, Inc. ("CBG") opposes the motions. [Docs. 35, 69.] The Plaintiff has also filed an opposed motion for an extension of time to conduct more discovery and file supplemental briefs pursuant to Rule 56(f) of the Federal Rules of Civil Procedure. [Docs. 69, 73.]

For the following reasons, the Court **DENIES** the Plaintiff's request for more time and **GRANTS** the Defendants' motions for summary judgment.

## I. Factual History

This case arises out of an alleged joint agreement to market and promote services relating to the 340B federal drug pricing program that enables certain health care facilities that serve large numbers of indigent patients ("DSH Facilities") to obtain drugs at discounted prices for prescriptions that they issue. Defendant McKesson is a large corporate distributor for prescription drugs and Defendant Per-Se, a wholly owned subsidiary of McKesson, manages revenue cycles and other

pharmaceutical program services in the health care industry. [Doc. 29-1 at 1.] Plaintiff Commerce Benefits Group is a third-party administrator that helps to manage employer benefits plans. *Id.* Plaintiff CBG provided health plan administration services to Defendant Per-Se prior to Per-Se's acquisition by McKesson in early 2007.

On September 6, 2006, Phil Pead ("Pead"), the Chief Executive of Defendant Per-Se, and Tom Patton ("Patton"), the CEO of Plaintiff CBG, set up a meeting at Plaintiff CBG's headquarters in Avon Lake, Ohio. The purpose of the meeting was to discuss possible business initiatives and opportunities for Per-Se and CBG, including the 340B initiative. [MacKenzie Dep., Doc. 29-14 at 43.] The meeting was tape-recorded by the Plaintiff, apparently unbeknownst to the Defendants, and subsequently transcribed. [Sept. Mtg. Tr. at 1.][1/] Patton represented the Plaintiff at the meeting, and Phil Jordan ("Jordan") led the group of Per-Se employees who attended the conference. Other individuals in attendance at this meeting included Jeanette Hobson ("Hobson"), an employee of Plaintiff CBG; Skip Best ("Best"), the vice president for pharmacy solutions at Defendant Per-Se; Scott MacKenzie ("MacKenzie"), president of pharmacy solutions at Per-Se; and Rita Russell ("Russell"), a senior director of pharmacy solutions at Per-Se. [Doc. 29-14 at 157-59.]

At the meeting, Tom Patton, the CEO of Plaintiff CBG, discussed his idea for marketing a 340B inventory management program to hospital system clients (hereinafter, the "340B initiative"). Patton's basic proposal was that by expanding the number of doctors and patients eligible to participate in the 340B federal drug pricing program, hospitals would realize significant savings, and Plaintiff and Defendants could receive a portion of those hospital savings as a fee. [Patton Dep.,

---

[1/] A DVD and copy of the transcript of the September 6, 2006 meeting was manually provided to the Court and distributed to all parties by the Defendants. [Doc. 29-4.]

Doc. 29-15 at 69-70; Best Dep., Doc. 29-11 at 43-48.] Under this initiative, Plaintiff CBG and its affiliated brokers would market the idea, and Defendant Per-Se would use its technology to implement the project. [Jordan Aff., Doc. 35-9 at 5-6.] After a successful sales call, the parties would then attempt to secure a contract from the hospitals. [Best Dep., Doc. 29-11 at 43-48.]

Throughout the next several months, Patton, often accompanied by Per-Se employees Skip Best or Holly Russo, made sales calls to various hospitals across the country and promoted the Defendants' 340B project, trying to convince hospitals to use certain health care plans that would encourage their own employees to obtain prescription drug treatment through the 340B Plan. Best estimates that the parties did 12-15 sales calls together. [Best Dep., Doc. 29-11 at 46-47.] Of these sales calls, Best testified that only two of these meetings, with Moses Cone Hospital ("MOCO") and with TriHealth, resulted in a "term sheet," or drafted contract, being presented to the client. *Id.* at 47-48. Neither of these clients ever signed an agreement for the 340B program. *Id.* During this period, Patton worked and communicated almost exclusively with Skip Best, who generally informed his superiors, particularly Scott Bagwell ("Bagwell"), about the joint sales calls. [Best Dep., Doc. 29-11 at 23-25, 115-117.]

In late winter 2007, Skip Best found out that his position at Per-Se Technologies, Inc. was being eliminated. [Best Dep., Doc. 29-11 at 61.] During this time, Defendant McKesson acquired Defendant Per-Se. [Sloman Decl., Doc. 29-8 at 1-2.] As he prepared to leave his job and in anticipation of administrative difficulties during the acquisition process, Best attempted on several occasions to convince his bosses to sign a written contract with Patton to ensure that their sales efforts would come to fruition. [Doc. 29-7 at 48.] Patton also was growing increasingly concerned about the lack of a formal business agreement between the parties. [Doc. 29-6 at 36.] On several

occasions between January 2007 and May 2007, Tom Patton contacted various employees of the Defendants in an attempt to secure a written contract for future business and the Defendants informed Patton that a tentative contract was being drafted.

In his deposition, Patton testified that he assumed that Skip Best alone could not contractually bind the Defendants to an obligation with the Plaintiff and that Best had to obtain permission from his superiors to engage in a formal contract with Patton. [Patton Dep., Doc. 29-15 at 48-49] Patton was informed that Scott Bagwell ("Bagwell"), the Senior Vice President of Sales and Marketing at Defendant McKesson, was the appropriate contact person and would be the individual with the authority to help create a contract with him. [Doc. 29-7 at 49.]

After numerous emails and telephone calls in the spring of 2007, which will be discussed later in this opinion, Bagwell informed Patton that the proposed contract between the parties would be delayed several months and that, in the meantime, the Plaintiff was not authorized to make any sales calls to potential clients on the Defendants' behalf. [Doc. 29-6 at 3, 5, 29-35.]

On May 18, 2007, apparently believing that no written contract with the Defendants would materialize, Plaintiff CBG sued Defendant McKesson in the Lorain County Court of Common Pleas. [Doc. 1-1.] The Defendants removed the case to this Court on July 9, 2007. [Doc. 1.] The Plaintiff brings claims against the Defendants for breach of contract, promissory estoppel, and unjust enrichment. [Doc. 53.]

## II. Procedural Background

On January 2, 2008, Defendant McKesson filed a motion for summary judgment. [Doc. 29.] Plaintiff CBG opposed the motion on January 16, 2008. [Doc. 35.] In its opposition, the Plaintiff also notified the Court that it voluntarily dismisses all claims relating to a second initiative between

the parties called the FSA Program. *Id.* at 2. The Defendant replied in support of its summary judgment motion on January 23, 2008. [Doc. 45.]

On February 1, 2008, Defendant Per-Se filed a motion for summary judgment. [Doc. 54.] On February 28, 2008, Plaintiff CBG filed an untimely opposition to Defendant Per-Se's motion for summary judgment in which it also requested additional time to fully respond to both Defendants' summary judgment motions pursuant to Rule 56(f) of the Federal Rules of Civil Procedure. [Doc. 69.] In its filing, the Plaintiff primarily argues that, as stated in its motion to compel discovery, the Defendants have allegedly failed to undertake a reasonable search for electronic documents as requested by the Plaintiff. *Id.*

On March 6, 2008, after holding two telephone conferences, conducting an in-person hearing, and allowing the parties to fully brief the motion and submit hearing memoranda, Magistrate Judge McHargh denied the Plaintiff's motion to compel. [Docs. 48, 62, 72.] Citing both parties' delay in conducting discovery in the case, the Magistrate determined that the Defendants had "searched extensively" for all documents, specifically forecasting documents relating to the 340B initiative, that the Plaintiff requested, and that any of those documents that had been located were submitted to the Plaintiff. [Doc. 72 at 2-3.] The Magistrate also noted that the discovery requests propounded by the Plaintiff did not appear to be relevant or necessary to the development of the Plaintiff's claims or to the response to the issues raised in the Defendants' summary judgment motions. *Id.* at 3.

This Court agrees with the Magistrate Judge and accordingly denies the Plaintiff's motion for more time to respond to the Defendants' summary judgment motions. The primary dispositive issue in these motions is whether a contract existed at all between the parties, and the additional

discovery sought by the Plaintiff appears to go more to the issue of damages than contract formation.

The Court will therefore decide whether the Defendants are entitled to summary judgment on all of the Plaintiff's claims in this opinion.

**III. Legal Standard**

Summary judgment is appropriate where the evidence submitted shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party has the initial burden of showing the absence of a genuine issue of material fact as to an essential element of the non-moving party's case. *Waters v. City of Morristown*, 242 F.3d 353, 358 (6th Cir. 2001). "A fact is material if its resolution will affect the outcome of the lawsuit." *Daughenbaugh v. City of Tiffin*, 150 F.3d 594, 597 (6th Cir. 1998) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The moving party meets its burden by "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). Once the moving party satisfies its burden, the burden shifts to the nonmoving party to set forth specific facts showing a triable issue. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986). It is not sufficient for the nonmoving party merely to show that there is some existence of doubt as to the material facts. *Id.* at 586. Nor can the nonmoving party "rely merely on allegations or denials in its own pleading." Fed. R. Civ. P.56(e).

In deciding a motion for summary judgment, the court views the factual evidence and draws all reasonable inferences in favor of the nonmoving party. *Matsushita*, 475 U.S. at 587-88. "The

disputed issue does not have to be resolved conclusively in favor of the non-moving party, but that party is required to present some significant probative evidence which makes it necessary to resolve the parties' differing versions of the dispute at trial." *60 Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987); see also *Celotex*, 477 U.S. at 322. Ultimately, the Court must decide "whether the evidence presents sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Terry Barr Sales Agency, Inc. v. All-Lock Co.*, 96 F.3d 174, 178 (6th Cir. 1996) (internal quotations omitted).

**IV. Discussion**

*A. Breach of Contract Claim*

Plaintiff Commerce Benefits Group makes a breach of contract claim against Defendants McKesson and Per-Se.[2/] The parties agree that no express written contract was ever created to market the 340B initiative. [Patton Dep., Doc. 29-15 at 46.] The Plaintiff says, however, that a contract can be implied from the statements, correspondence, and actions of the parties taken between September 2006 and May 2007. Pursuant to this alleged "agreement to agree," Plaintiff CBG says that it and various Per-Se employees, namely Skip Best and Holly Russo, made joint sales calls to various hospitals across the country and that the parties intended to formalize their venture with a written contract. The Plaintiff claims that the Defendants wrongfully terminated this alleged contract and that Plaintiff CBG has suffered damages as a result.

The parties agree that this contractual dispute is governed by Ohio law. In a breach of contract claim, the plaintiff has the burden to present evidence as to the following elements: (1) the

[2/] In this opinion, the Court will discuss the identical motions for summary judgment filed by Defendants McKesson and Per-Se jointly. Because the Court ultimately concludes that a contract did not exist between Plaintiff CBG and the Defendants, the Court declines to address the issue of whether Defendant McKesson is liable for the acts of its wholly owned subsidiary, Defendant Per-Se.

existence of a contract, (2) the performance by the plaintiff of its obligations, (3) the breach by the defendant, and (4) damages. *See Doner v. Snapp*, 649 N.E.2d 42, 44 (Ohio Ct. App.1994).

The Court notes at the outset that the issue of whether an implied oral contract was formed is a question for the court in reviewing a motion for summary judgment. *See, e.g., Digital 2000, Inc. v. Bear Communications, Inc.*, 130 Fed. Appx. 12, 18-19 (6th Cir. 2005). The Court is obligated to construe the facts supporting the existence of an implied or oral contract in the light most favorable to the plaintiff, but the decision as to whether a contract exists may properly be made by this Court.

1. Contract Formation

In the state of Ohio, "a contract requires (1) an offer and acceptance (i.e., a meeting of the minds); (2) on a lawful subject matter; and (3) sufficient consideration" in order to be enforceable. *See Shafer v. P.S.I. Paper Systems, Inc.*, 61 Fed. Appx. 949, 952 (6th Cir. 2003) (citing *Carlisle v. T & R Excavating, Inc.*, 704 N.E.2d 39, 43 (Ohio Ct. App. 1997)). Ohio recognizes three types of contracts: (1) express; (2) implied in fact; and (3) implied in law. *See Rice v. Wheeling Dollar Sav. & Trust*, 99 N.E.2d 301, 304 (Ohio 1951). In this case, the Plaintiff seems to allege the existence of an implied contract in fact.

The Sixth Circuit has explained that an implied contract exists "when one party renders services or materials to another when the latter knew or should have known that he would be expected to pay for the benefit he received." *Shafer*, 61 Fed. Appx. at 952. In order to enforce an implied contract, a plaintiff "must prove 'an offer by one side, acceptance on the part of the other, and a meeting of the minds as to the essential terms of the agreement.'" *N.A. Water Systems, LLC v. Allianz Underwriters Ins. Co.*, 2005 WL 1105069, at *4 (N.D. Ohio 2005) (citing *Burgin v. Madden*, 2002 WL 1290869, at *4 (Ohio Ct. App. 2002)). However, a plaintiff need not show that

the parties formally exchanged promises. Instead, a "contract implied in fact may be proved by showing that the circumstances surrounding the parties' transactions make it reasonably certain that an agreement was intended." *Lucas v. Costantini*, 469 N.E.2d 927, 929 (Ohio Ct. App. 1983).

In Ohio, "agreements to agree 'are enforceable when the parties have manifested an intention to be bound by their terms and when these intentions are sufficiently definite to be specifically enforced.' Therefore, overall, we consider whether the parties manifested a sufficiently definite intention to be bound such that an agreement would be specifically enforceable, or whether they merely negotiated toward a formal contract without ever reaching it." *Telxon Corp. v. Smart Media of Delaware, Inc.*, 2005 WL 2292800, at *17 (Ohio Ct. App. 2005) (internal citations omitted). *See also* *Normandy Place Assoc. v. Beyer*, 443 N.E.2d 161,164 (Ohio 1982).

Here, the Court concludes that the facts of this case do not establish that an oral or implied contract exists between the parties regarding the 340B initiative. The evidence does not support the Plaintiff's position that the parties manifested an "agreement to agree" to market the 340B product. While Tom Patton and Skip Best, among others, clearly hoped that their joint business venture would be successful and that someday a written contract would be created to formally ensure that Plaintiff CBG would profit from deals made with clients to whom they had made a sales pitch, their hope for a future business relationship alone did not create a contract between the parties.

The Plaintiff places significant emphasis on its position that an oral contract was created during the September 6, 2006 meeting, which was taped by the Plaintiff. According to the transcript of the meeting, Patton first presented his marketing strategy for the 340B project and the Defendants' reaction was very positive. Eric Bornstein, the chief technology officer of Defendant Per-Se, said, "So the split is – something for the hospital, something for Tom and something for us." [Sept. Mtg.

Transcript at 5.] Phil Jordan also gave encouragement to Patton by stating, "My message to Tom [Patton] is, we thought it through, understand the accounting, and we have some thoughts on the replenishment side and we are ready to go." *Id.* at 6. Scott MacKenzie also immediately cautioned at the meeting, however, "Now, I want to make sure we aren't over-representing – there is still some work here – we'll do the accounting . . ." *Id.*

Later in the meeting, the Defendants discussed their desire to "cooperatively sell the first few deals" but expressed some concern about the likelihood of success in convincing hospital clients to buy into the Plaintiff's Community Health Plan scheme. [Sept. Mtg. Tr. at 10.] The Plaintiff responded, "There is no question – this is your business. You are going to go after this type of thing no matter what, but if we can assist, we would like to . . ." *Id.* As the Per-Se employees generally discussed what compensation might be owed to Plaintiff CBG under the proposed marketing idea, Phil Jordan said, "I guess I had better see it. My answer is – I absolutely don't know what this is about but he can explain it to me later." *Id.* at 9. Near the end of the portion of the meeting dealing with the 340B marketing project, Tom Patton stated, "If it is ok, I will follow-up with you, Skip." *Id.* at 12.

While the Court recognizes that the words exchanged at the September 6, 2006 meeting resulted in hopeful promises of future business relationships for the Plaintiff, the Court concludes that the meeting was essentially a negotiation toward a formal contract and not a definite promise that can be specifically enforced by the Court. As Patton himself testified in his deposition, the September 6, 2006 meeting did not result in specific promises or details about the possible joint venture and Patton merely felt "comfortable we'd get that worked out at the right time." [Patton Dep., Doc. 29-15 at 44-45.]

Further, the correspondence between the parties in the months following the September 6, 2006 meeting demonstrated that a definite, specific business agreement had not yet been reached. The day after the September 6, 2006 meeting, Skip Best emailed Patton and said, "I am looking forward to working with you and [your team] closely to flesh out our Regional Health Plan 340B strategy . . ." [Doc. 29-7 at 82.] Shortly thereafter, Best and Patton began to make sales calls to market the Defendants' 340B product as previously described.

On January 16, 2007, Patton emailed Best and began to express his concerns about the impending acquisition of Per-Se by Defendant McKesson and his desire to "get a formalized agreement." [Doc. 29-6 at 36.] On January 26, 2007, Best relayed this message to his direct supervisor, Scott Bagwell and stressed the "importance of formalizing the relationship." [Doc. 29-7 at 48.] Best also suggested proposed financial terms for Plaintiff CBG. In March 2007, Patton emailed Best, saying that he wanted to schedule a meeting to "finalize the Contract and Compensation issues, which we could not properly address without the presence and input of Scott Bagwell." [Doc. 29-7 at 50.]

On March 31, 2007, Best told Bagwell that Patton wanted to schedule a meeting to discuss, in part, the "status of the agreement that is currently in draft." [Doc. 29-6 at 55.] Best again emphasized the importance of Patton's services and political connections in marketing the 340B initiative and provided Bagwell with a list of the possible clients that Patton had introduced to the Defendants. *Id.* In response, Bagwell wrote to Best and Patton, stating that he would call Patton but that "none of the dynamics mentioned in this email was ever explained to me, other than Tom Patton's involvement." *Id.* at 54. Bagwell also expressed concern about the 340B initiative and stated that "there are many disconnected dots in the scenario [] you're describing." *Id.*

On April 3, 2007, Patton and Bagwell spoke on the phone. This conversation was recorded. [Doc. 29-6 at 29-35.] During the conversation, Bagwell asked Patton for documentation regarding any marketing efforts that Plaintiff CBG had undertaken on behalf of the Defendants. *Id.* Bagwell also informed Patton that a tentative contract was being drafted by the company's attorney, Jay Sloman, but that he had concerns about the entire venture. Bagwell testified that these concerns arose because he had such little knowledge of the Plaintiff's involvement and also was somewhat troubled about the legality, ethics, and likelihood of success of the entire proposed 340B initiative. *Id.* *See also* Bagwell Dep., Doc. 29-10 at 58-60, 65-68, 182-84.

On April 23, 2007, Bagwell emailed Patton and Todd Houston, an employee of the Plaintiff, among others, and informed them, "The distribution contract with CBG will be delayed several months, while we operationally fine tune our sales, consulting and the delivery of our total 340b solution. . . As we absorb the McKesson acquisition and fine tune operationally, I will have more time to devote to negotiating a partner agreement with CBG." *Id.* at 5. The following day, Houston replied that he looked forward to formalizing the agreement with CBG and that CBG would continue to market and promote the Defendants' product. *Id.* at 4-5.

Bagwell responded the next day, stating, "I want to be very clear, until we have a contract in place with CBG, we are not authorizing any sales calls on McKesson's Easy340b solution." *Id.* at 3. On April 26, 2007, Patton replied and demanded that Bagwell "confirm that you are in a position to override the documented agreements made by the COO of Per Se . . ." [Doc. 35-1 at 19.] Bagwell followed up, again asking for the documentation referenced by Patton and explaining, "I have no documentation from anyone." *Id.* On May 2, 2007, having received no documentation from Patton, Bagwell emailed Patton and stated, "[U]ntil we have a formal agreement between our

organizations, no further sales calls should be made for Easy 340(b) by your organization." [Doc. 35-1 at 28.]

On May 10 and 11, 2007, Houston sent emails to St. Johns Health, a McKesson customer and an entity to which Plaintiff CBG had made a sales call regarding the 340B initiative. [Doc. 29-6 at 22.] Houston also sent the emails to Bagwell and Patton, among others. In the email, Houston discussed his recent sales call with St. Johns, promoted McKesson's product, and told the client that he was arranging a meeting for them with McKesson. *Id.* at 21.

That same day, Bagwell replied and emphasized, "McKesson, as stated before, is not authorizing CBG to make any representations to any customer that there is a relationship with McKesson or Easy340b." *Id.* at 19. Bagwell told Houston that his email complicated McKesson's own business deals because St. Johns was already a current customer of McKesson. *Id.* Bagwell concluded, "Your last sentence that 'we' will arrange a meeting is in direct conflict, with my prior email to cease any representation or association with McKesson, until there is a formal contract between McKesson and CBG. I will ask CBG again to stop implying there is a formal relationship to any customer between CBG and McKesson." *Id.* at 19.

The words and actions of the parties, as recorded in meetings, phone calls, and emails between September 2006 and May 2007, indicate that the parties were generally hopeful about working together to market the 340B project, but that there was no meeting of the minds as to the specific details of any proposed joint venture. Even Skip Best, the Defendants' employee who had the most significant contact with Plaintiff CBG throughout the duration of their alleged joint venture, testified during his deposition that "[t]he only commitment that I made to Tom Patton was that there was a contract in development." [Best Dep., Doc. 29-11 at 30.] The Plaintiff knew that no formal

contract existed between the parties and was not able to produce any evidence of an implied or oral contract when requested by Bagwell.

Further, insofar as the parties did generally contemplate bilateral obligations to jointly market the 340B initiative, numerous details of the relationship were never discussed or finalized. For example, the parties did not discuss the compensation that Plaintiff CBG would receive.[3/] The parties did not discuss the duration of their purported business venture or even the duration of the contracts that they were attempting to persuade potential hospital system clients to sign.[4/] Further, in discussing their proposed joint venture, all of the parties recognized the necessity of having a client registration process by which the Plaintiff would present a list of proposed client sales calls, the Defendants would approve certain of those potential clients, the Defendants would authorize CBG to commence a sales call, and then the parties would keep track of which client accounts were developed by the Plaintiff. The essential purpose of this process was to avoid "channel conflict" in marketing strategies, but the parties never created this client registration process. [Best Dep., Doc. 29-11 at 84-85.]

The indefiniteness and lack of specificity as to any promises exchanged between the parties, and the failure to discuss or finalize important terms like compensation, duration, and business procedure, all contribute to this Court's finding that the parties did not manifest a sufficiently definite intention to be bound such that an agreement would be specifically enforceable by this Court. *See*

---

[3/] Patton testified during his deposition that "there was no dollar amount set, absolutely not, at that meeting..." [Patton Dep., Doc. 29-15 at 44.] Additionally, Patton testified during his deposition, "There was never any mention that Per-Se, McKesson, NDC or anybody would pay us a commission. . . I never asked for it." *Id.* at at 150-151.

[4/] Patton assumed that his involvement with the Defendants would last "[h]owever long the deal lasted. . . I figured if we didn't bring a force to the party that made money for them, we wouldn't keep doing business." [Patton Dep., Doc. 29-15 at 65-66.]

*Telxon Corp.*, 2005 WL at *17. This Court therefore finds that the parties did not have a meeting of the minds as to the essential terms of the agreement to market the 340B initiative sufficient to legally create a contract.

2. The Alleged Contractual Breach

Even if this Court were to assume that an implied contract was created between the parties to jointly market the 340B initiative to DSH Facilities across the country, the Court concludes that the Defendants did not breach the agreement. Construing the facts in the light most favorable to the Plaintiff, the purported oral contract did not require the Defendants to commit to any particular sales ventures with the Plaintiff, to pay the Plaintiff a consulting fee or other administration costs, or even to reimburse the Plaintiff for the travel and time expenses associated with his multiple sales calls to promote the Defendants' 340B product.

Patton, the CEO of Plaintiff CBG, testified repeatedly that he did not expect to be reimbursed by the Defendants and that he recognized that the travel and business expenses incurred in the context of promoting the Defendants' product was a high-risk venture. As Patton testified in his deposition:

> Q: Then were there any other times when you felt that you had been promised, firmly promised something, by NDC or Per-Se or McKesson in relation to the 340B initiative?
>
> A: No. I mean, there was no, like, expenses and things, no, no. I did everything at my own peril, there was no question about that.
>
> Q: Kind of an R&D investment?
>
> A: You're right, I saw this as an investment. It was a great opportunity. If we wouldn't have run into Mr. Bagwell, it would have paid off for everybody.

[Patton Dep., Doc. 29-15 at 58.] Best also testified that "we never had any discussion" regarding the

reimbursement of Plaintiff CBG's expenses. [Best Dep., Doc. 29-11 at 52-53.]

According to the alleged oral contract as construed by both Best and Patton, the only way that Plaintiff CBG expected to receive financial benefit from its joint venture with the Defendants was if the parties managed to convince a DSH Facility client to sign a 340B contract. Upon contracting with the DSH Facility, the parties were then to receive shares of revenue generated by the savings created by the 340B program directly from the DSH Facility. As Patton testified during his deposition:

> Q: Was it your understanding that the scope of the customer deals on which Commerce Benefits Group would receive compensation would be limited to customers that you brought Per-Se and Commerce Benefits Group into?
>
> A: Absolutely. I was not, you know, and this is something that I thought about, there is nothing cut in stone anywhere that I wouldn't be participating in on everything they did with the ideas I brought, but that was never my intent. I brought the ideas to them, I wanted their salespeople to do what they could do. I didn't want any piece of what they did without my marketing force, my brokers and consultants and myself. If we didn't bring it to the table, I didn't want any piece of it. I didn't ask them for -- I gave them my -- those ideas they could market on their own. That's what I felt. That's not something we covered, but that's something that I, and I'll tell you here, honestly, that's the way I believe it will be. The quid pro quo, to me, was going to be -- I was told that their marketing people would then try to get us into, if they had hospital clients that were interested in community health plan concepts, that type of thing, things where Commerce could bring other concepts to the facilities, nothing to do with, you know, it would just be a value added for the Per-Se people. That's how we would benefit from that. But no, I did not expect an income stream from business that they developed on their own without our input.
>
> Q: Even though they were using these same concepts that you developed?
>
> A: That was gift.

[Patton Dep., Doc. 29-15 at 63-64.]

Thus, under the terms of the alleged implied contract, no money was to exchange hands between the Plaintiff and the Defendants; the Plaintiff would only receive income from the

completion of a 340B sale with a DSH Facility or other health care entity; and any money would come solely from the client itself. [Doc. 29-6 at 74.]

In this case, the parties never managed to close a 340B deal with a potential client during the period of their alleged joint enterprise. [Bagwell Decl., Doc. 29-5 at 1-2; Best Dep., Doc. 29-11 at 47-48.] To this date, the Defendants have not signed any 340B contracts with the potential clients that Plaintiff CBG helped to recruit. [Bagwell Decl., Doc. 29-5 at 1-2.] The Defendants have not made any profit from the businesses that Plaintiff CBG helped to solicit. *Id.* Houston also testified that the Plaintiff's sales calls to hospital employers "never got that far" and that no potential client decided to move forward and implement the 340B program. [Houston Dep., Doc. 29-13 at 34.]

In this case, the parties were essentially negotiating to enter a joint venture. Joint ventures, like partnerships, may be terminated by either party at any time absent some express agreement to the contrary. Here, since the parties did not discuss the duration of the alleged contract for services and the anticipated time period for the joint venture cannot be reasonably determined from the record, the purported contract was presumptively terminable at will by either party. *See* 18 Ohio Jur. 3d Contracts § 260 (2008) (stating that under Ohio law, "[w]here the contract does not in express terms or by fair implication fix the duration thereof and it does not appear that a reasonable time is intended, the contract is subject to be terminated at the pleasure of either of the parties."). Further, since none of the parties gained any profits or sustained losses that the alleged joint venture was obligated to pay during the period of the alleged contract, the joint venture could be dissolved at any time. Even Patton testified that he understood that the alleged implied contract would only last so long as the joint venture was profitable and valuable for both parties; he had no expectation as to the specific duration for the business relationship. [Patton Dep., Doc. 29-15 at 65-67, 120-21.]

The unilateral decision of Plaintiff CBG to market the Defendants' 340B initiative without having a formal contract in place was a high-risk venture with a potentially high payout, but, unfortunately for the Plaintiff, its hopes for an amicable working relationship with the Defendants did not succeed. This Court, therefore, finds that in the unlikely event that an enforceable implied contract exists in this case, the Defendants did not breach the agreement because they were free to terminate it.

The Court grants summary judgment in favor of Defendants McKesson and Per-Se on the Plaintiff's breach of contract claim.

*B. Promissory Estoppel Claim*

In Ohio, courts traditionally invoke the doctrine of promissory estoppel to "prevent a person from denying or asserting anything that by that person's own actions, words, representations or deeds [is] contrary to truth." *Columbus Trade Exchange v. AMCA Int'l Corp.*, 763 F. Supp. 946, 952 (S.D. Ohio 1991). Promissory estoppel "aids in the enforcement of promises by, in effect, supplying the essence of consideration where necessary to prevent injustice." *Blackwell v. Int'l Union, UAW*, 458 N.E.2d 1272, 1276 (Ohio Ct. App. 1983). To establish a promissory estoppel claim under Ohio law, a plaintiff must show "(1) a clear and unambiguous promise; (2) reliance upon the promise by the promisee; (3) reliance by the promisee that is both reasonable and foreseeable; and, (4) injury to the promisee as a result of the reliance." *Baseball at Trotwood, LLC v. Dayton Professional Baseball Club, LLC*, 204 Fed.Appx. 528, 540 (6th Cir. 2006) (internal citation omitted).

In this case, the Court has already concluded that Plaintiff CBG failed to demonstrate a "clear and unambiguous promise" made by the Defendants. Even in the unlikely event that the actions and words of the Defendants taken together created an expectation of future business for the Plaintiff,

that promise was riddled with ambiguities, including questions regarding compensation and duration of the business relationship. Further, the Plaintiff has not shown that the Plaintiff's reliance on the Defendants' purported promise to jointly market the 340B initiative was reasonable. The facts of the case indicate that Patton knew that the parties did not have a formal agreement and that his expenses incurred in marketing the Defendants' 340B technology were undertaken "at my own peril, there was no question about that." [Patton Dep., Doc. 29-15 at 58.]

The Court thus grants summary judgment to the Defendants on the promissory estoppel claim.

*C. Unjust Enrichment Claim*

In order to succeed on an unjust enrichment claim under Ohio law, the plaintiff must prove three elements: "(1) a benefit conferred by a plaintiff upon a defendant; (2) knowledge by the defendant of the benefit; and (3) retention of the benefit by the defendant under circumstances where it would be unjust to do so without payment ('unjust enrichment')." *In re Congrove*, 222 Fed. Appx. 450, 458 (6th Cir. 2007) (citing *Hambleton v. R.G. Barry Corp.*, 465 N.E.2d 1298, 1302 (Ohio 1984)). The Plaintiff does not specifically explain the grounds for asserting its unjust enrichment claim, but the Court surmises that the Plaintiff's argument is based either on the allegation (1) that the Defendants wrongly profited because of deals obtained from the Plaintiff's 340B initiative marking efforts, or (2) that the Defendants wrongly profited because they used Patton's ideas for expanding the 340B program without compensating him. Both theories of unjust enrichment must fail in this case.

The Plaintiff has failed to make a showing that the Defendants received any benefit from the Plaintiff's marketing efforts regarding the 340B drug pricing program. As stated earlier, the

Defendants did not sign any contracts with potential clients that Plaintiff CBG had introduced regarding the 340B initiative. Further, the Defendants did not gain any profit from these proposed transactions. If anything, it appears from the record that some of the Plaintiff's marketing calls may have potentially harmed the Defendants' business interests due to conflicting marketing strategies. The Plaintiff has thus failed to show that it conferred a benefit upon the Defendants, let alone that any benefit conferred was unjustly retained.

Further, the Plaintiff has not demonstrated that the Defendants unjustly retained any benefit conferred regarding Tom Patton's creative ideas for expanding the numbers of physicians and patients eligible under the 340B program. Even if this Court assumes that Patton's idea was original and that the Defendants may someday benefit from the use of such idea, Patton himself stated that he never intended to be compensated for his brainstorms; the only compensation he expected would arise from the joint marketing efforts between the parties. In fact, Patton said that the ideas and concepts he presented to the Defendants were a "gift" to them. [Patton Dep., Doc. 29-15 at 63-64.]

The Plaintiff thus fails to prove its claim of unjust enrichment and the Court grants summary judgment to Defendants McKesson and Per-Se.

## V. Conclusion

For the reasons stated above, the Court **GRANTS** the Defendants' motions for summary judgment and **DENIES** the Plaintiff's motion for additional time to conduct discovery.

IT IS SO ORDERED.

Dated: March 20, 2008

s/ *James S. Gwin*
JAMES S. GWIN
UNITED STATES DISTRICT JUDGE